BRUNSWICK DIGGERS, INC.
*vs.*
ANTHONY GRACE AND SONS, INC.

Kennebec. Opinion, January 22, 1963.

*Richard B. Sanborn,* for Plaintiff.

*Harold J. Rubin,* for Defendant.

SITTING: WILLIAMSON, C. J., WEBBER, TAPLEY, SULLIVAN, SIDDALL, JJ. DUBORD, J., was present at the argument but retired before rendition of decision.

WEBBER, J. The defendant, hereinafter called the Builder, was a general contractor employed by the United States Navy to complete land development and the construction in Brunswick of 277 dwelling units for military service personnel. The plaintiff, hereinafter referred to as the Contractor, was organized as a corporation by its owner and sole stockholder, Mr. Allen, to subcontract a portion of the work involved in the project. On July 11, 1959 the parties entered into a written agreement by which the Contractor undertook the initial work of "clearing and grubbing" for the sum of $20,440. Plaintiff actually commenced work a few days before the formal execution of the contract. On July 22, 1959, again by written agreement, plaintiff contracted to excavate and backfill the foundations for the 277 dwelling units for the sum of $55,775. In addition, plaintiff was to excavate, trim and backfill for sewer and water connections (called "laterals") from the foundations to the street lines for a unit price of 50c per lineal foot. On

August 13, 1959 the parties entered into a third written contract by which plaintiff agreed to install certain elements of the surface drainage system for the sum of $38,500. It is not disputed that some time in November, 1959 the parties entered into an oral agreement by the terms of which the Contractor was to construct roadways, sidewalks and utilities outside the main project location but connected with it. For this "off site" work plaintiff was to receive $28,000. The contracts called for payments by the Builder on monthly requisitions. At the request of the Contractor, however, payments were made weekly in advance, the amount of these advances being determined by separate agreement as to each. On April 18, 1960 the Contractor wrote to the Builder as follows:

> "This is to notify you that any contractual relations between your company and Brunswick Diggers, Inc. has been breached and, therefore, I expect your company to advance capital to pay for materials,, rentals, and labor.
>
> It was agreed that your company would supply the necessary capital to expedite the contract. This you have failed to do. Also in order to expedite your work we have cooperated to the extent that we have done much extra work which was not contracted for. The extent of the extra work is so great and intermingled with that contemplated in the contract I can see no other way but to continue work on a cost plus basis or renegociate (sic).
>
> In reference to payments and payment of bills, the only reason that we haven't paid all bills to date is because we haven't been paid enough by your company.
>
> Please advise on what basis you wish to settle this situation as Brunswick Diggers, Inc. can work no longer without knowing how you intend to advance operating money."

It may be noted in passing that the plaintiff adduced no evidence that the defendant had agreed to "supply the necessary capital to expedite the contract." Before writing the foregoing letter claiming breach of contract, the plaintiff had ceased operations with about 70% of its work completed. The plaintiff had received advances of $118,770.87 and when it ceased operations it owed about $45,000 to material men and suppliers whose claims became an obligation of the defendant under the "Miller Act" so-called. When requested to state its conditions for performance of the contracts, the plaintiff demanded a renegotiation which would provide approximately $73,000 additional for work claimed to have already been done and a further sum of $70,000 for the work remaining. These conditions were rejected by the defendant, which then completed the work at a cost to itself of $53,655.88. Plaintiff brought its action asserting breach of contract and defendant responded by counterclaim. A jury returned a verdict for the plaintiff in the sum of $72,000. Defendant seasonably filed its appeal from the judgment below.

Since the plaintiff has raised some question as to what may be open to the defendant on appeal, we take this occasion to comment on the amendment to M. R. C. P. Rule 73 (a) promulgated August 1, 1962 which provides:

> "An appeal from a judgment preserves for review any claim of error in the record including any claim of error in any of the orders specified in the preceding sentence. An appeal shall not be dismissed because it is designated as being taken from such an order, but shall be treated as an appeal from the judgment."

This amendment was not intended to add to or change the substance of the Rule as it stood before amendment, but was adopted for the purpose of clarification and to resolve any doubts which may have been created by the language

of dicta contained in *Knowles* v. *Jenney,* 157 Me. 392. See 1962 Supplement to Field & McKusick, Maine Civil Practice, page 58.

We view the evidence in the light most favorable to the plaintiff in order to ascertain whether there was credible evidence that the defendant failed to perform its contracts and that the plaintiff was excused from full performance on its part. The plaintiff complains of delays in its work progress alleged to have been caused by the defendant and to have been so substantial and material as to amount to breach of contract. Plaintiff also asserts that it performed many extras which were ordered by the defendant and for which defendant refused payment. The Contractor was bound to inspect and did inspect the plans and specifications covering the entire project. It was obvious from such an inspection that the project was of great magnitude and would require the services of many subcontractors who with the Builder would be working simultaneously with large quantities of material and equipment. Plaintiff was bound to anticipate that work done under such circumstances would be at times hampered and unavoidably delayed. The parties provided in their agreements that they were "subject to delays caused by * * * other causes beyond the control of the parties hereto." In an effort to expedite the work and keep interference at a minimum, the Builder held meetings with its subcontractors at least weekly and often more frequently for the express purpose of correlating their efforts. The evidence is devoid of any proof that the Builder did not make diligent efforts to eliminate delay. It is not every grievance, irritation or dissatisfaction which may be caused to a contracting party which will constitute a breach of the other party's contractual obligations. In the instant case specific problems were met on a day to day basis and resolved by agreement. Moreover, it is apparent that as the work progressed, although suggestions and

criticisms were exchanged, there was no thought on the part of either the Builder or the Contractor that the contracts had been broken. On September 21, 1959 when the work had been in progress for about two and one-half months the Contractor wrote to the Builder a reminder that cold winter weather was coming and suggested that if the concrete work on the foundations could be expedited "it will definitely save both (of) us money." The letter also requested information as to arrangements for putting in "laterals" so that the work might be done immediately after each unit was excavated. Although much of the delay of which plaintiff now complains is alleged to have occurred during the summer months of 1959, there was no suggestion in this letter that the plaintiff considered such delays to have been so unreasonable, excessive or damaging as to amount to breach of contract.

In November, 1959, as already noted, the plaintiff and defendant negotiated their fourth contract. It seems unlikely that Mr. Allen would have made this agreement for his corporation if he had known or believed that defendant had not thus far properly discharged its obligations under the first three contracts. It is even more improbable that plaintiff would have been satisfied with an *oral* agreement in November if it had deemed the conduct of the defendant to have been in violation of the three prior *written* agreements. From time to time during the winter the Builder wrote letters to the Contractor requesting better progress in its work and full compliance with the plans, specifications and contracts, but there is no evidence that the Contractor asserted any breach on the part of the Builder. In fact, Mr. Allen testified that as late as March 29, 1960 he considered the contracts to be in full force and effect.

The first claim of breach and demand for the payment of money for alleged delays came only at or about the time the above quoted letter of April 18, 1960 was sent and at a time

when the Contractor had already quit the job. We conclude that the plaintiff failed to adduce any evidence of delays caused by the defendant amounting to breach of contract as a matter of law or which the plaintiff regarded or treated as a breach. "Whether given conduct can be legally held a breach of a certain contract, i.e., whether capable of being so held is a question of law." *Stachowitz* v. *Anderson Co.*, 121 Me. 534, 536.

As to the claim that defendant broke the contracts by refusing to pay for authorized extras performed by plaintiff, the evidence again fails to offer any proof of breach. The contracts provide:

> "No extra work or alterations of the Plans and Specifications shall be deemed authorized except by written order by the Builder to the Contractor, specifying such extra work or alteration of Plans and Specifications and the agreed cost, if any, therefor."

Some such provision would seem to have been essential if the Builder was to keep any proper control of its own cost or seek to recover the cost of any extra work from the Navy. Mr. Allen testified that this was modified by oral agreement and that extra work was to be done on verbal instruction only. This testimony is not corroborated and defendant asserts the contrary. Plaintiff produced no adequate records to support his claim for extra work. His entire testimony with respect to the nature and extent of alleged extras is vague, unsatisfactory and unconvincing. Whatever the fact may have been as to verbal modification of the written clause, in at least one instance written authorization was obtained and the extra approved in accordance with contract procedure. The first attempted summation of claims for extra work came in the form of a summary sheet dated January 29, 1960. This purports to summarize charges for extra work for the period from August 26, 1959 to January

6, 1960 and the total claimed is $2915.25. As of February 2, 1960 another statement was prepared covering extras from December 15, 1959 to January 11, 1960 and, although no exact total is carried out, the aggregate claim for this period does not appear to have exceeded $2170.40. Sometime in March or April, Mr. Witham, plaintiff's engineer and foreman, and the person most cognizant of the detailed progress of the work, was asked by plaintiff to prepare a summary of the position in which the parties then stood. The first page thereof represented a summary of all of the extras of which Mr. Witham then had knowledge. The total there presented is $8229.75 of which one item of $1980 appears upon its face to represent a claim of damage for alleged delay rather than a claim for extra work performed. This summary includes as its first item the $2915.25 carried forward from the summary sheet of January 29, 1960. The evidence therefore indicates that at this stage plaintiff's maximum claim for alleged authorized extras did not at most exceed an amount of approximately $10,000, yet almost immediately thereafter we find the demand made upon the defendant for payment for extra work suddenly and inexplicably increased to $42,999.25. Moreover, the defendant was offered no detailed explanation of the basis or composition of this new and greatly increased claim. Simultaneously the plaintiff demanded $30,000 more for the work already done and a renegotiation of the contracts which would provide an additional $70,000 to complete the job.

It is apparent that this is not a case of the Builder refusing to pay the reasonable cost of authorized extra work. There is no evidence whatever that the defendant ever declined to pay for authorized extras. In fact, it is apparent that the amount by which the defendant overpaid the plaintiff more than exceeds the amount of the claimed extras as first summarized by plaintiff. All that the defendant flatly and properly refused to do was to renegotiate the contracts

and agree to pay the plaintiff approximately $143,000 in addition to the $118,770.87 already paid. The plaintiff was not legally entitled to a renegotiation of the contracts and the defendant's refusal to accede to this exorbitant demand was not a breach of contract as a matter of law. The defendant in no way prevented the plaintiff from completing performance and obtaining whatever compensation would then have been justly due.

It may well be and doubtless is true that the plaintiff concluded that the job had been underbid. It seems obvious that plaintiff did not have sufficient capital to carry contracts of this magnitude to the point of completion and final payment. However unfortunate these circumstances may be, they will not suffice to excuse the non-performance of the plaintiff or permit it to shift the burden of responsibility to the other contracting party. See *Kenney* v. *Pitt,* 111 Me. 26, 29.

At the close of the plaintiff's evidence the defendant made an oral motion for a directed verdict, which motion was renewed at the close of all the evidence. Although the record fails to disclose the forms of these motions or the reasons assigned in support of them, the comments of the presiding justice in ruling thereon made it clear that defendant had urged as grounds therefor that the evidence viewed in the light most favorable to the plaintiff failed to show any breach of contract by defendant, and that if any such breaches had occurred, they had been effectively waived by subsequent conduct of the plaintiff. The defendant seasonably filed its motion for judgment notwithstanding the verdict, again setting forth as the first ground therefor that "there was no credible evidence before the jury which would sustain a finding that there was any breach of the contracts by the defendant." We are satisfied that the requirements of M. R. C. P. Rule 50 have been complied with and the Law Court may itself direct judgment for the defendant

notwithstanding the verdict. The case was well and fully tried below. The record consists of over 700 pages of testimony and exhibits. There is no indication that the plaintiff could sustain its burden of proof upon a new trial. The judgment must be directed.

As to the defendant's counterclaim, it has been stipulated that if the court should order judgment for the defendant upon the plaintiff's complaint, the counterclaim may be dismissed with prejudice. The entry will be

> *Appeal sustained.*
>
> *As to plaintiff's complaint, judgment for the defendant notwithstanding the verdict.*
>
> *As to defendant's counterclaim, ordered dismissed with prejudice.*