**DREW BROWN LIMITED, Plaintiff, Appellant,**

v.

**JOSEPH RUGO, INC., et al., Defendants, Appellees.**

**No. 7713.**

United States Court of Appeals, First Circuit.

Jan. 12, 1971.

Thomas F. Needham, Bangor, Me., with whom Stearns, Finnegan & Needham, Bangor, Me., was on the brief, for appellant.

John W. Philbrick, Portland, Me., with whom Howard H. Dana, Jr., and Verill, Dana, Philbrick, Putnam & Williamson, Portland, Me., were on the brief, for appellees.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

McENTEE, Circuit Judge.

In October 1966, defendant, Joseph Rugo, Inc., a Massachusetts general contractor, entered into an agreement with Husson College, Bangor, Maine, for the construction of six campus buildings.[1] The contract with the college was to be fully performed by April 9, 1968. On November 28, 1966, plaintiff, Drew Brown Limited (Brown), a Canadian corporation, subcontracted with Rugo to furnish and erect all the reinforcing steel required for the project at $240 a ton.[2] The subcontract provided that Brown was to submit a progress estimate by the sixth day of each month indicating the work it had completed by the end of the previous month. Rugo would then pay Brown "this estimate less a deduction for all previous payments and less a ten percent (10%) reserve." Each monthly payment became due and payable no later then the twenty-fifth day of the month that the estimate was submitted. The reserve was payable on the thirtieth day of the month after the subcontract was completed.

Between November 1966 and May 31, 1968, Brown delivered 814 tons of reinforcing steel to the job site, of which it erected 777 tons. Pursuant to a collateral agreement between the parties, Rugo erected 27 tons between January 31 and May 1, 1968.[3] On May 31, 1968, before the subcontract was fully completed, Brown quit the job, claiming that Rugo had breached the subcontract. Up to that point, Brown had billed Rugo $198,163.05 for the 814 tons, plus authorized extras, although under an accurate estimate it should only have billed for the 777 tons delivered *and erected*. Rugo had paid Brown a total of $170,-600.90, withholding the ten percent reserve ($19,816.30). The unpaid difference of somewhat less than $8,000 was one of the reasons cited by Brown for its repudiation of the contract.[4]

From the inception of its work, Brown continuously requested that Rugo furnish an advance schedule or schedules for the performance of Brown's work. Brown felt that it needed such scheduling in order to arrange the material at the job site and adjust the size of its crew to the construction plan. But no such schedule was ever supplied. When the completion deadline of April 9, 1968, had passed, Brown wrote to Rugo stating that it no longer felt bound by the subcontract. It further stated that the long overdue back balance ($7,969.42) alone gave it every right to terminate the contract. However, at Brown's request, the parties met on May 14, 1968. At this meeting Brown offered a novation of the subcontract so that it could complete the reinforcing steel work and confirmed this proposal by letter dated May 21, 1968.[5] Not having received a reply, Brown then wrote to Rugo,

"As we have not had a reply to our proposal presented to you on May 14th, 1968 and our letter of May 21st, 1968, you leave us no other alternative but to remove our personnel from the project, as of Friday, May 31st, 1968.

"In spite of your promises, our long overdue account amounting to $7,969.-42 has not been paid, therefore, we

1. The codefendant, Maryland Casualty Company, is surety on the payment bond furnished by Rugo to Husson College.

2. The exact amount of reinforcing steel required was not set forth in the subcontract, but the price of $240 a ton was conditioned on a minimum of 896 tons being supplied. In the event the total tonnage required was less than said amount, a deficiency payment of $20 per ton was to be made to Brown for the difference between 896 tons and the lower amount.

3. During this period Brown's work crew was not on the job site. They returned to the job between May 3 and May 31, 1968.

4. In May 1968 Brown claimed that $7,-969.42 of its bill had been due and owing since December 1967 and that the only amount Rugo had a right to withhold was the ten percent reserve.

5. Brown stated that this proposal "is the basis of our completing the placing of the reinforcing steel on the Husson College project as of this date."

consider our contract with you to be terminated."

After Brown left the project, Rugo completed Brown's work at a cost of some $31,000.

Brown bought this diversity suit against Rugo to collect the balance of $27,562.15 allegedly due on the subcontract.[6] Rugo counterclaimed for $35,000 damages sustained by reason of Brown's failure to complete its subcontract. The case was tried to the district court sitting without a jury. The court found that Rugo did not breach the subcontract; that Brown's reasons for quitting the job were insufficient to justify its termination; and that Brown was liable to Rugo for $63.03 on its counterclaim. Brown appealed.

In this court Brown contends that Rugo's failure to coordinate and schedule the work entitled Brown to treat the subcontract as terminated and recover the unpaid balance thereof. In support of this contention it argues (1) that time was of the essence as regards the performance of both Rugo and Brown, and (2) that Rugo as general contractor was responsible for the overall direction of the work. Accordingly, Brown concludes that Rugo had a duty to exercise some overt action such as scheduling so that Brown would have a better chance to complete its work by the April 9 deadline. But this argument assumes too much. While time was of the essence with respect to Rugo's obligations to Husson College, this right did not extend to a subcontractor.[7] Moreover, Rugo's failure to prosecute the work did not make Brown liable to Husson College for such delay.[8] Nor did Rugo's responsibilities to Brown as enumerated in the subcontract include the advance scheduling of work for the latter's convenience. Furthermore, Brown was unable to prove that scheduling was a custom of the trade. While we might agree that Rugo's failure to provide such scheduling was ungenerous, the irritation to Brown caused by such failure was not a breach of the subcontract. *Cf.* Brunswick Diggers, Inc. v. Anthony Grace and Sons, Inc., 159 Me. 21, 25, 187 A.2d 391, 393 (1963); *accord,* Godburn v. Meserve, 130 Conn. 723, 37 A.2d 235 (1944). Moreover, it was specifically provided in the subcontract that Brown was to see the plans and specifications for the buildings, and, in signing the subcontract, Brown agreed that it had reviewed those plans and familiarized itself "with the conditions under which said work is to be performed." Brown inserted many amendments in the subcontract, and it seems to us that, if it felt that schedules were that important, it should have added a clause requiring the same.

The district court found that Brown terminated its subcontract "because of Rugo's failure to agree to revised terms for completing the contract which had been proposed by Drew Brown and because of Rugo's failure to pay an outstanding balance of $7,969.42, against which Rugo was claiming back charges of $8,504.16." The court further found that Brown's termination was unjustified. In this appeal Brown no longer claims that it could terminate because Rugo failed to renegotiate the

---

6. In its complaint Brown also complained that it was entitled to additional damages of $71,944.80 for Rugo's failure to schedule the work properly. The district court dismissed this claim at the conclusion of plaintiff's case for failure to show a breach by Rugo or damages suffered by Brown. Fed.R.Civ.P. 41(b).

7. Brown argues on appeal that the terms of the general contract were "incorporated" into the subcontract. To the extent that this is so, certainly it was not intended that Rugo would be responsible to Brown for deadlines which were set for the benefit of Husson College. Moreover, Brown was obligated to "carry to completion the work undertaken by the agreement as the progress of the work requires." The fact that the April 9 deadline had passed added nothing to Brown's rights.

8. *See, e. g.,* Joseph Lande & Son v. Wellsco Realty, 131 N.J.L. 191, 197, 34 A.2d 418, 422 (1943); Cox v. Curnutt, 271 P.2d 342, 344 (Okl.1954).

contract; Rugo had no duty to do so, in any event. Brunswick Diggers, *supra*, 159 Me. at 29, 187 A.2d at 395. Brown does contend, however, that it was entitled to terminate the work for Rugo's failure to make payments as required by the subcontract. In the circumstances of this case, we must disagree. First of all, we note that, prior to Brown's termination, the parties had entered into a collateral agreement whereby Rugo would erect some of the steel and Brown would reimburse Rugo for this expense. On May 31, 1968, Brown knew that it owed Rugo for at least nine tons of steel erected by Rugo under the collateral agreement although it disputed the amount owed.[9] Secondly, Brown billed Rugo for 814 tons of steel estimated as delivered *and* erected, although in fact Brown never erected more than 777 tons during the whole job. Finally, Brown brought its men back to work on the site at a time when it claimed Rugo was in arrears. This shows that the lack of payment was not hampering Brown in the fulfillment of its contract. Taking these circumstances into account, in our opinion Brown had no right to terminate the contract over such a collateral issue. Wilson v. Wilson, 157 Me. 119, 130, 170 A.2d 679, 685 (1961); Clifford L. Swan Co. v. Dean, 151 Me. 359, 362, 118 A. 2d 890, 892 (1955); Wright v. Haskell, 45 Me. 489, 492 (1858); Restatement, Contracts §§ 274–275, 397 (1932); *see also* Lynch v. Stebbins, 127 Me. 203, 206, 142 A. 735, 736 (1928); 6 Corbin, Contracts § 1253, at 10–11 (1962).

We conclude, therefore, that the district court did not err in holding that Brown's termination of the subcontract was unjustified and that Rugo could counterclaim for damages for its breach.[10]

Affirmed.

9. The district court found that Brown actually owed Rugo for erecting 27 tons under the collateral agreement and approved the lump sum of Rugo's cost estimates for the steel erected both before and after Brown quit the job. Rugo estimated the erection of the 27 tons at $8,-780.48, although in the May 14th negotiations with Brown it claimed only $8,-504.16.

10. We note that neither party objected to the calculation of damages in the counterclaim.